Todd's Heirs
*vs.*
Wickliffe.
under the *Civil Code, sec. 97.*

---

Case 57.

Fur. Eq.

## Todd's Heirs *vs.* Wickliffe.

### APPEAL FROM FAYETTE CIRCUIT.

1. The consideration of love and affection is a sufficient consideration between husband and wife, and will support a deed from the wife to the husband when made to carry into effect an anti-nuptial agreement between the parties.

2. A conveyance by husband and wife of the real estate of the wife to a third person, with the intent that it be reconveyed to the husband alone, to invest him with the title to the estate, is valid if made without the coercion of the husband, or any undue influence over the wife. (*Scarborough vs. Watkins & Wife,* 9 B. Mon. 546.)

3. The rule of law which requires of a guardian, trustee, or attorney contracting with the ward, *cestui que trust,* or client to show the entire fairness of the transaction, has never been applied to husband and wife where the wife conveys property to the husband, as by the ancient common law there could be no dealings between them.

4. The Statute of 1796, (*Stat. Law,* 440, sec. 4,) authorizes *femes covert,* in conjunction with their husbands, to convey their estate of inheritance upon privy examination in the manner pointed out by that act, and declares such conveyances to be as effectual to pass all her right as if she was an unmarried woman.

5. The chancellor will not presume that a conveyance by a wife to her husband, made through a third person, is fraudulent, and require of the husband proof of its fairness. (*Scarborough vs. Watkins & Wife,* 9 B. Monroe, 546.)

[The facts of this case are stated in the opinion of the court. The case was argued at the — term 1856, and affirmed by a division of the court; and upon petition filed, a re-hearing was granted, and the case was argued and decided at the Winter Term, 1857, by a majority of the court, Judge Simpson dissenting.—REP.]

*J. B. Beck and E. W. Hawkins,* for appellants—

Made the following points in this case:

1. Without contesting the right of a wife to give her land to her husband in consideration of *love and affection,* as recognized by this court in the case of *Scarborough vs. Watkins,* 9 B. Monroe, 549, where, in the language of the court, " the husband was destitute of property," and there was not the slightest evidence of any misrepresentation, undue influence, or improper conduct by the husband, denied that this was a case of that character, and contended 1st. That where the husband and wife, as in this case, undertake to make a cold, calculating bargain, and the wife is overreached by a hard, unfair and unconscientious contract, neither the courts of England or America have ever permitted it to stand, but in all such cases will throw " the *onus* upon the husband to ' relieve the contract of suspicion, and to show in ' the case of a purchase that he has paid a fair and ' full equivalent for the property." (*Law Lib.* 57, *p.* 42.)

2. That if, as in this case, there was a contract before the marriage to the effect that the wife was to have the whole of her own settled upon her, that if in any attempt after the marriage to execute this anti-nuptial contract either by *fraud, mistake,* or otherwise, the husband instead of the wife got the whole estate; the court will not permit such an execution of such a contract to stand.

The counsel proceed to discuss the following propositions:

First. That previous to the marriage of Mr. and Mrs. Wickliffe, they did make a contract by which all of Mrs. Wickliffe's estate, and a portion of Mr. Wickliffe's, by way of *jointure or settlement*, was to be settled upon Mrs. Wickliffe in fee, he to have the present beneficial use of it during his life; and that in an attempt, some eleven months after marriage, to execute this anti-nuptial contract, Mr. Wickliffe, instead of Mrs. Wickliffe, got the whole of her estate in fee. And insist that as the deeds under which Mr. Wickliffe claims have their only foundation in this abortive and fraudulent attempt to execute this anti-nuptial contract, that the deeds themselves are fraudulent and void.

Second. That in this attempt to execute this anti-nuptial contract, Mr. Wickliffe, as an inducement to Mrs. Wickliffe to execute the deeds, fraudulently covenanted with her to stand seized and possessed of several tracts of land for her separate use and benefit during her natural life, instead of such settlement as agreed upon before marriage.

Third. But waiving for the argument all anti-nuptial contracts and this violation of covenant, and even then the deeds are, according to Mr. Wickliffe's construction, the result of a contract of bargain and sale, as Mr. Wickliffe paid Mrs. Wickliffe no adequate consideration.

Upon the first proposition it was contended that the proof to establish the fact, that by the anti-nuptial contract, all of Mrs. Wickliffe's estate, and a portion of his by way of jointure or settlement, was to be settled upon Mrs. Wickliffe, is in plain and simple, yet substantial and unimpeachable form, as is shown by the tripartite deed. The deed under which Mr. Wickliffe claims is the only foundation of whatever title he may have. The deed contains the whole of the anti-nuptial agreement. It contains these words: "And whereas the said Robert Wickliffe and

Mary O. Wickliffe, with a view to effect their said understanding and agreement," &c. This, it is insisted, is a *mere attempt at the execution of this contract*, but has no bearing upon it; and they must be clearly distinguished the one from the other. The attempted execution is quite different from the contract itself; that cannot change the contract itself. This difference between the contract and its execution, is the very thing complained of.

This *recital* of the agreement in manner and form as made; the time when made; the *consideration* moving the parties to it; the *subject matter* of the agreement, is the only evidence which under the rules of law can be admitted on these points. The recital, in the language of the books, "operates as an estoppel, is primary evidence which cannot be averred against, and which forms a muniment of title." (1 *Greenleaf*, 23; 4 *Pet.* 1.) It "is not the less positive because it is introduced by *a whereas.*" (2 *Adol. and Ellis*, 278,) and need not be otherwise proven. (1 *Greenleaf*, 23.)

Let us analyze the contract: " Whereas it was ver-' bally agreed between the said Robert Wickliffe and ' Mary O. Wickliffe, his wife, previous to their inter-' marriage." This extract shows the important fact that the agreement was made " *previous to their intermarriage.*" This is important, because it goes back to the origin of the whole transaction, and shows the inducement to it, and the true intention and purpose of Mrs. Wickliffe when she was free, and before she came under the influence of Mr. Wickliffe. That previous agreement, whatever it shall be decided to be, must control the whole case and all acts of the parties done after marriage. This recital being inserted in the deed it will have to be adhered to. The draftsman thought it important to state that it was before marriage as the basis of the title, though the defendant seems now to treat it otherwise.

Again. "That they would at convenient time make a proper disposition of the estate of Mary O. Wick-

liffe, and a portion of the estate of the said Robert Wickliffe, by way of jointure or settlement upon the said Mary." "A portion of the estate of said Robert by way of jointure or settlement," was to be made "upon the said Mary." This sentence is coupled with that sentence which says "the estate of said Mary O." by the copulative conjunction *and*, and of course both estates must pass together; they cannot be separated. The rules of grammar authorize the transposition of this sentence, and to make it read thus: "That they would at convenient time make a proper disposition of a portion of the estate of the said Robert by way of jointure or settlement, and the estate of the said Mary O. Wickliffe." Thus read, the sentence can mean nothing else than that the whole estate of Mrs. Wickliffe was to be settled upon her, as well as a portion of the estate of Mr. Wickliffe. This construction is confirmed by what follows. "And by which the said Mary O. Wickliffe should be vested with full power by last will and testament to emancipate or otherwise dispose of any or all the slaves and their descendants of which she was possessed at the time of intermarriage." Now, this term, "and by which," must refer to one of two things.— It must refer either to the latter clause of the sentence making a disposition "of a portion of the estate of the said Robert by way of jointure or settlement upon the said Mary," or it must refer to the agreement comprehending both clauses of the sentence united. It cannot refer to the latter clause, because to make upon Mrs. Wickliffe a jointure or settlement out of Mr. Wickliffe's estate by which she would have power to free her own negroes, would be sheer nonsense; but the right to free negroes cannot constitute a jointure or settlement. The term "by which," must therefore, of necessity, apply to the agreement comprehending both clauses of the sentence, which thereby rivets the two estates together, and passes them both linked and forged together upon Mrs. Wickliffe.

Lastly in regard to the contract, "and that the beneficial interest in her real estate shall vest in the said Robert." This word *beneficial*, is derived from two Latin words, *"bene"* and *"facio*," to make well or to make profit, and evidently takes its legal meaning from the old feudal benefice of which *Kent, vol.* 3, *page* 495, says "the same class of persons who 'had been characterized as volunteers or compan- 'ions, in Germany, became loyal vassals under the 'feudal grants. These grants, which were first call- 'ed *benefices*, were in their origin for life, or perhaps 'only for a term of years. The vassal had a right to 'use the *land* and *take the profits*, and was bound to ren- 'der in return such feudal duties and services as 'belonged to a military tenure. The property of the 'soil remained in the lord, from whom the grant 'was received. The right to the soil and the profits 'of the soil were regarded as separate and distinct 'rights." Webster in his large dictionary says, *bene-ficial* means " advantages, confering benefits, useful, profitable, helpful, receiving, or entitled to receive, advantage, use or benefit." Burril says, *beneficial* means " benefit or advantage, producing or attended with profit or advantage, having or enjoying a benefit or profit—a term applied both to estates and persons as beneficial interest, beneficial owner." The word then which is here used to designate the interest which Mr. Wickliffe was to have in the land of Mrs. Wickliffe, is as good a word to show that he was only to have a life estate in them—a temporary use or benefit, or the rents and profits as contra-distinguished from the fee simple interest as could have been used. It cannot mean that Mr. Wickliffe was to have any greater interest than a life estate, for that would conflict with the previous part of the contract, which has already given the fee simple interest to Mrs. Wickliffe. If however, there was a direct conflict, it would be the same to appellants, because then by the established law of construction, the former part of the contract giving the estate to

Mrs. Wickliffe must stand and the latter be rejected. But the courts always give such construction to a contract as will make the *whole operative* if possible, as the Latin maxim has it, *ut Res magis valeat quam pereat.* This agreement will be construed by this court so as to give effect to the whole of it, and establish my first proposition giving Mrs. Wickliffe her estate in fee simple, and to Mr. Wickliffe the present or beneficial use during life.

The counsel on the other side will insist that the parties understood what they intended to do by their own contract, and have done it according to their understanding of what it was, and that there is no better evidence of what it really was, or that the parties changed their agreement. This cannot avail. If, in the first place, this recital be a falsehood fabricated for the occasion, it presents so glaring a case of fraud that it will leave the defendant in a worse dilemma than if it were all true. Again: If the antinuptial agreement of the parties be as recited, they could not after marriage change the agreement, even with the consent of both parties. Again: The parties say they have not changed their agreement, and reciting the anti-nuptial contract as above recited as the foundation of, and the only inducement to, the whole transaction. It is said in Stephens' *Nisi Prius,* *page* 1060, " In the construction of a covenant no at-
' tention is paid to the acts of the parties, or the in-
' terpretation they may put upon it." In 3 *Vezy,* 298, a learned judge said, " I strongly protest against the
' argument used in *Cook vs. Booth,* as to construing
' legal instruments by the equivocal acts of the par-
' ties and their understanding upon it, which I will
' never allow to affect my mind—I will never con-
' strue a covenant so."

The true meaning of the anti-nuptial contract is, that Mrs. Wickliffe was to have her real estate in fee simple, although in another part of the deed her real estate is vested in Mr. Wickliffe. It will not do for the other party to deny the anti-nuptial con-

tract altogether. If they may do this, then may the other party deny the part of the deed on which they rely, and they are without title.

This brings us to the main question, can this deed to Mr. Wickliffe, reciting, as it does, as the only consideration which induced it—this anti-nuptial contract which gave the lands to Mrs. Wickliffe—be sustained?

The authorities are, that if a man make a proposal merely for a settlement, and the marriage follow, he will be bound by it. (4 *Vezy*, 501.) There is high authority to the effect that parties having once entered into articles in view of marriage, cannot change these articles even before marriage. (See 1 *Fonb.* 200; 9 *Beav.* 570.) Lord Langdale so said in one case, giving the reason " that undue influence had not been prov-
' ed, but the court did not wait for proof of it; it
' might be exercised by soothing, or it might have
' been by violence; he could not think the husband
' was entitled to consider her as emancipated." Upon the point of changing articles, the court is referred to *Tabb vs. Archer*, 3 *Hen. and Munf.* 399; *Lee vs. Stuart*, 2 *Leigh*, 76; *White's Eq.' Ca.* 17; 1 *Rand.* 322; 1 *Dev. and Bat.* 227.

The case resolves itself into these two points:

1. That Mr. and Mrs. Wickliffe having made a contract before marriage, to the effect that the whole of her estate, and a portion of his, by way of jointure or settlement, was to be made upon Mrs. Wickliffe, that they could not after marriage, even if they had in good faith changed their minds, make the estate upon Mr. Wickliffe, and that consequently the deed to Mr. Wickliffe is void.

2. That the parties having made such a contract as is recited, before marriage, and not changing their minds after marriage, but *re-asserting* and *re-adopting* that contract, as the only consideration of the deed which conveys the estate to Mr. Wickliffe instead of Mrs. Wickliffe, this consideration failing the deed must fail.

The parties seem to have done precisely the opposite of what they intended to do. If this is not conclusive of fraud, what would be ?

1. How do these deeds stand under the general charge of *fraud*, as made in the case, even if they had been between two persons equally free to act. It does seem that they should be cancelled for *fraud*. But this is a transaction between husband and wife. Between the weak, the amiable, and confiding Mrs. Wickliffe, and the veritable Robert Wickliffe, her husband. On the 12th September, 1827, Mrs. Wickliffe was possessed of real estate worth $100,000; and as the wife of R. Wickliffe, entitled to dower in the most magnificent estate in the west; before the nightfall of this day she had divested herself of every thing. Was this all done for love and affection ?

2. At the execution of these deeds, and as part of them, Mr. Wickliffe entered into a covenant to stand seized and possessed of the lands, to-wit: those of Mrs. Wickliffe's, and one tract of his own, called the Ellerslie farm, to the use and benefit of Mrs. Wickliffe during her natural life; " and in the event that she should survive him, then she was to have an estate for her life," &c. This deed as to Mr. Wickliffe is not to have any effect till after his death. This, it is insisted, is a perversion. Mrs. Wickliffe is to have these lands during her natural life, and of course the covenant takes effect from the date of the deed. The covenant expressly provides that Mr. Wickliffe is to stand seized and possessed of them for her use and benefit during her natural life. How could he stand seized, &c. after his death ? The covenant clearly gives to Mrs. Wickliffe the rents and profits of these lands from the date of the deed. Mr. Wickliffe admits, substantially, in his answer, that he has not given these rents and profits to his wife. He has paid off his promises by a covenant which he never performs but with promises; but she must wait until he dies. The defendant's answer throws farther light on this subject. He purports to give the conversations and

acts of the parties on the day the deeds were executed. Says he told his wife he was perfectly willing to give her written permission to free her slaves at her death or to free them then; but with regard to her land, he would not accept of it and leave her to settle with his executors and creditors as to her third of his estate, but was willing to accept of the land with her right in case of survivorship, to own it during life. That he would prefer taking the property in trust for her himself during their lives, and at her death it should vest in him absolutely in case he survived; but if he should die first, then she was to hold it during life, and at her death to pass to his heirs or devisees; that in addition to her property, that he would add his Ellerslie farm. After explaining to her the process necessary to make this arrangement, she replied she did not want any written obligation from him, but was satisfied to take her dower or whatever else he would will her, and immediately the deeds were executed." Does not Mr. Wickliffe hold up the curtain rather *too long ?* Behind the screen a jar is discovered, and at a critical time. Although we have not Mrs. Wickliffe's propositions in full, he gives his replies so fully that we are enabled to see her propositions as clearly as if her words had been given. Mrs. Wickliffe desired three things. 1. The right to free her negroes. 2. The right to the immediate rents and profits of her lands, because there is no other conceivable interest in her lands which Mr. Wickliffe could take which would leave her to settle with his executors and creditors. 3. The right to one third of his estate. The first desire was granted—the right to free the negroes. But the last two are denied. They were legal rights, and altogether reasonable. The appellee knew well the deep seated feeling of Mrs. Wickliffe for the emancipation of her slaves, and said in substance, if you free the slaves,I must have the lands. It is charged in the pleadings that the appellee made use of this deeply seat-

ed feeling of his wife to procure the execution of the deeds. Do not the circumstances establish the fact?

The appellee says that Mrs. W. said she did not desire any written obligation from him to her. Then there was something to be done by Mr. Wickliffe which has not been done. It was something of such importance as to require a writing, else her reply was entirely inappropriate. It would be desirable to know precisely what it was she did not require to be placed in a written obligation. May we not conclude that it was to re-convey these lands in accordance with the anti-nuptial contract. Here there is an import in these documents, according to appellee's own showing; an important obligation, which presents a clear ground for relief in equity, even as between two persons equally free and competent to contract—can the case stand as between husband and wife?

But she " was satisfied to take her dower or whatever else he would will to her." Then she did not know that by the deeds all her dower had passed from her.

These facts show that Mrs. Wickliffe signed these deeds in ignorance of her rights, as shown by the appellee's own statements, which is a good ground in equity for cancelling the deed.

The case is before the court with the facts as stated, more strongly proved in the confessions of the appellee, in such form that he has no power to disprove them. He has not attempted to disprove them.

Under my second proposition are here presented four grounds of relief, either of which should result in the cancelment of these deeds, to-wit: *Fraud, duress, omission of important obligations, and ignorance of rights.*

3. I proceed to the third and last proposition. If the deeds were given for *love and affection*, simply as some of those are between husband and wife, which have been supported by the courts, they would present quite a different case. Such deeds are sup-

ported because the chancellor has no means of estimating the *love and affection* of woman's heart; but when she undertakes, as in this case, to *sell or exchange* property, he can estimate the consideration which induced the contract, and he will always see to it that she is not overreached by a hard and unconsionable bargain, but that she is fairly and equitably dealt by; and he will scrutinize the transaction with extreme caution and jealousy; and the law comes to the chancellor's aid, with its presumptions that the wife is at all times under the coercion of the husband, and throws the *onus* upon the husband to relieve the contract of suspicion, and to show in case of a purchase, that he has paid a full and fair equivalent for the property. But these are not deeds of gift for *love and affection*. The consideration must be stated in the deed—can be stated no where else. And there is not in all these deeds any mention of *love and affection*—not a word from which it can be infered, but on the contrary there are positive words of *bargain and sale*.

As the deeds were then a plain business contract of bargain and sale, what did Mr. Wickliffe pay for the lands? Is this such a contract of bargain and sale as should stand between husband and wife? *What did he give, and what did he receive?* Mrs. Wickliffe received nothing for her lands. All that Mr. Wickliffe contends he paid is embraced in the covenant of the tripartite deed, and that, upon its face, as we have already seen, expressly states that the property embraced in it " is in lieu of dower in his other lands." How then can the defendant put it down to the account of Mrs. Wickliffe's lands? Is he not estopped by the plain words of the instrument?

But placing the appellee's own construction upon the covenant, he was to secure to Mrs. Wickliffe a portion of his own estate by way of settlement. This covenant is no settlement. What is the meaning of the term? The best definition is taken from 1 *Rice's Eq. Rep.* 315, and is as follows: " The term marriage ' settlement is never applied to a mere executory

'agreement by which the title to property is not 'changed; but is always understood to mean the ac- 'tual conveyance or executed contract by which not 'only the property is changed, and the title vest- 'ed, but by which the property to some extent is tied 'up and rendered available." It was incumbent on Mr. Wickliffe to so vest the title to the property in Mrs. Wickliffe that it should be "tied up" from ex- ecutors and creditors and all contingencies, and ren- dered available. But after this covenant to stand seized, Mr. Wickliffe could on the next day have sold all these interests, or mortgaged them to a *bona fide* purchaser without notice, who could have held against Mrs. Wickliffe. It is well settled, as stated by *Bell on the Property of Husband and Wife, page* 413, that "where the consideration given by the husband 'for the property of the wife rests upon covenant 'only, neither he nor those claiming in his right, will 'be entitled to have the property without performing 'the covenant." And it is said by *Sir Wm. Grant,* 9 *Vezy,* 87, that "while the obligation of the husband 'remains unperformed, neither he nor any person 'claiming under him, could be permitted to receive 'the wife's fortune upon any other condition than 'making good the wife's fortune." (See also 1 *Vezy,* 376.)

But give the defendant the benefit of all he has paid, and what is it according to his own showing? He gives a life estate in the Ellerslie farm of 250 acres, to commence after the termination of his own life, worth at the date of the deed, from one to two dollars per acre per year. Not worth on sale at the time, $100. What did Mr. Wickliffe receive? Prop- erty worth at that time $100,000, according to Mr. Wickliffe's own confessions, $65,000.

Mrs. Wickliffe also surrendered a dower in her husband's estate in 15,000 acres of land. According to Mr. Wickliffe, the slaves were worth $3,000. Only three are shown to have been emancipated at her death. These facts will strike the mind of the most

callous with great force, and it is not deemed neces-
sary to cite authority to show that the chancellor will
not give his aid to carry out unconscientious bargains.
I understand that the law is settled that where the
husband and wife undertake to contract with each
other—where he purchases land from her, as in this
case, it is incumbent upon him to show that he has
paid a full and adequate value for it; that the *onus* is
upon him to show that payment and that value. As
Story says, (1 *Story's Eq. sec.* 336,) in reference to
heirs, reversioners, &c.

Under all the circumstances of this case, the ap-
pellee was bound to make a competent settlement on
his wife suitable to her circumstances. As he has
not done so, the deeds ought to be cancelled; and
this large estate which has been enjoyed so many
years, and by which he, his children, and grand chil-
dren have been enriched, should be returned to those
to whom it rightfully belongs.

*Geo. Robertson* on the same side—

My colleagues having filed copious briefs I will
submit only a few supplemental considerations of a
general character.

1st. The heirship of the complainants is sufficiently
established by the answer which does not deny the
allegations on that subject at all, or as required by
the Code of Practice.

2nd. The former suit by the heirs of Robert and
Levi Todd, to establish the right of their ancestors,
as *sole devisees* of John Todd, of the lands now in
contest, could not operate as a bar to this suit,
founded on a *joint right* of the kindred of John Todd,
and of his wife, (Miss Hawkins) as the heirs of Mrs.
Mary O. Wickliffe. Were there no other objection
to the bar, the fact that both the right, and the par-
ties, are essentially different, would alone be con-
conclusive.

3rd. The statute of limitations is equally unavail-
ing. This suit was brought as promptly after the

disposition of the other as a suit by such a multitudinous party could conveniently be instituted. By analogy, twenty years after Mrs. Wickliffe's death, would be the limitation to a suit for the lands; and as long as such suit may be maintained, voidable conveyances of them may be avoided, and fraudulent incumbrances removed. (*McCreery's heirs vs. Howell's heirs,* 7 *Dana,* 321.)

The appellee has no cause to complain of the delay; for after this suit was brought he struggled most desperately to elude investigation, by resisting on the most flimsey grounds; and during the period which had interlapsed, important testimony for the appellants was lost by death.

4th. Nor has the forlorn hope of champerty any foundation. There was no champerty; and surely there was nothing immoral, unusual, or unjust in the contract made by one of the appellants, with a portion of the others, who, while they desired this suit, yet, being unacquainted with the law and the facts, which would govern the decision of it, were unwilling to unite with the other heirs in paying certain fees to counsel, and subjecting themselves to indefinite expense.

The merits of the case must therefore be met and investigated. And the fact that the appellee has striven to evade such investigation, and has urged such indefensible preliminary objections, shows that he and his counsel have but little hope of success on the merits.

Then, what is the case, as presented on the merits?

John Todd, a young lawyer, and his two brothers, Robert and Levi, adventured to Kentucky in the spring of the year 1775, to seek their fortunes, and consequently were of the first band of pioneers. They stood side by side, and shared all the perils and privations of the first foot-steps of civilization in a savage wilderness.

Thus supported by his sympathizing brothers, he laid the foundation of a large real estate in and

around Lexington, and in other portions of Kentucky. And in August, 1782, fell at the battle of the Blue Licks, leaving a noble widow, who had consoled him in "the dark and bloody ground;" and one infant child, who reared by that mother to womanhood, married a Mr. Russell, who, in a few years, left *her* also a widow. And the appellee truly describes her a paragon of her sex, in all the moral graces which most adorn it in its best estate.

During her widowhood, Robert Wickliffe, the appellee, had brought suits against her, and been instrumental, as lawyer, in recovering large portions of her real estate; but still she retained a large real estate worth about $100,000, in the enjoyment of which she lived like the sun, the centre of the social circle of Lexington, dispensing charity and hospitality wherever she moved.

In this enviable condition, childless, affluent, and forty-four years of age, Mr. Wickliffe, a millionaire, with *seven infant children*, the youngest not more than four years of age, sought her as a wife and mother of his children, and finally obtained her hand; thus taking on herself so much care, and so heavy a burthen, she would, without any ante-nuptial contract, have been potentially entitled to *dower* in his immense real estate, consisting of 15,000 acres of the best lands in Kentucky, and of other tracts " *too tedious to mention,*" *and also to the fee in her own lands, and he would have been entitled only to a joint use of her lands during their joint lives,* the *fee* going, at her death, to *her* heirs.

This being the status of the parties, actual and legal, *he, after marriage, managed to get her whole real estate* to himself and his heirs. And in 1845 she died, *bereft of every particle of property, either of her own estate or his, and this achievement was the result not of gift but of diplomacy, bargain and unilateral contract.*

To overhaul this strange and elaborate transaction, and restore her estate to the blood by which it was obtained, and sacredly consecrated in the affec-

tions of just such a woman, is the object of this suit.

And how is the claim resisted? Not by a concise and perspicuous statement of facts, which might have been made on half a sheet of paper, but by a long, invalid, inconsistent, and irrelevant rigmarole, covering *forty-eight* pages!! And in which the defendant not only *denies* that there was any ante-nuptial contract, but alleges, that Mrs. Wickliffe, *before the marriage, offered to give him her whole estate, which he deferred accepting*.

Now it is intrinsically incredible, that a woman of her character and principles would, as a *bonus* to *such a man* to marry her, and *allow* her to be the *nurse* of his children, have offered to give him, already of boundless wealth, her large landed estate, which the kindred of her father and mother, who had embalmed it in blood and tears, would have a sacred right to expect at her death. And, moreover, the *recital* in the tripartite deed, which is conclusive on him, shows, indisputably, that there *was an ante-nuptial contract*, and that there was no *gift* or offer to give by Mrs. Wickliffe to him. And his answer being thus *discredited* in a *vital matter*, is *not* to be *accredited* as to anything material in *his favor*.

5th. When candidly examined, the agreement, *as recited and written by the appellee himself*, is not susceptible of more than one rational and consistent interpretation; and that is, that Mrs. Wickliffe should have secured to her, in a "proper" *mode*, her *own* estate, and a portion of Wickliffe's, *in lieu of dower*, reserving to herself the power to manumit by will her ten slaves, and to him the *beneficial* interest in her real estate while they should live together.

To make a proper disposition of *her estate* and a *portion* of his, by way of jointure or settlement upon her, cannot possibly be so tortured as to be made to mean a *portion of her estate and a portion of his*, nor to mean that the fee in *her estate* should be conveyed to him, or *settled on him, instead of her*, and especially

as such construction would make the provision for reserving to him the *beneficial* interest in her real estate perfectly and ridiculously absurd, inconsistent, or meaningless; as the fee simple was in her and could not be divested by marriage, securing it to her, by any possible disposition, could not entitle him to any other than a beneficial interest. And "proper disposition" of it on her, necessarily means a disposition of it in a mode proper for securing it to *her*, not to him, otherwise than as specified, that is, the usufruct as husband. Besides, absurd and inconsistent with the words, a "proper disposition of her estate, and a *portion of his*, by way of settlement or jointure on her," as it would be to *assume* that the parties meant that the fee simple in her whole estate should be settled on *him*, and that *she* should only enjoy a beneficial interest in a *portion* of it during her life; the absurdity is overwhelmingly increased by the provision that *he* is to enjoy the beneficial interest which is irreconcilable with the idea that *he* is to *have the fee* and *she* a *beneficial interest during her life*.

She was to retain *her own estate*, and to have a *portion of his*, but, as he would be entitled to enjoy the use of her real estate during their cohabitancy, and, moreover, ought to repair and preserve it, the parties thought it but reasonable that he should have the control of the use, and of the profits, although the title was by *a proper disposition or conveyance to be secured to her against any other disposition of it by him or by her during his marital control over her;* and hence that beneficial interest was reserved by him by the *express terms* of the *ante-nuptial contract* as *recited and written by himself*, and therefore to be construed most strongly against him, even were it ambiguous. But we insist, that as to her right to her own estate, after his or her death, there is no sort of possible ambiguity. And as this contract was the basis on the faith of which she tied the gordian knot, it ought to be strictly adhered to, and fully upheld by this court.

A conveyance of her legal title to a trustee for her ultimate benefit, reserving to him the use during their joint lives, and to her, power to emancipate her slaves, would have been settling on *her her own estate*, by a proper disposition of it for effectuating the end of the ante-nuptial contract. Any other essentially different disposition would be inconsistent with the provisions of that contract, and with the presumed purposes of the parties in making it.

It is almost self-evident, that the great object was, not to *give* him her lands, but to secure *his* against her right to *dower* in them. And even had this been done by securing to her all she owned, and only a contingent use for life in the *little* Ellerslie farm, the contract would have been very improvident on her part, and he would have been greatly the gainer by it.

There is no pretence for the *assumption* that she gave or intended to give her estate to him, and then surrender dower in his vast estate, in consideration of a contingent right to the use of the Ellerslie farm, and about *one-half* of her own land for life; all of which, according to his *answer*, and the *proof*, would not have been worth more than from $750 to $1,000 annually; when, as he *says*, her *annual expense of living*, before he married her, exceeded $2,000. The recital in the tripartite deed, of the ante-nuptial contract, *as the consideration of the conveyance to Chinn*, and by him to the appellee, is *conclusive* on this point. And all those conveyances being simultaneous, should be regarded as one document.

The conveyance to Owsley, and by him to Wickliffe, are shown by his answer itself to have *no other object or consideration* than to supply a supposed defect in the *authentication* of that to Chinn, and to substitute Owsley for Chinn for *consummating* the ante-nuptial agreement. This can therefore have no other effect than that to Chinn, or than if it had been made instead of Chinn's, and at the same time.

Neither the appellee in his long answers, nor either of his counsel in their oral arguments, has seriously attempted, by analyzing the *recited* agreement, to show that it is *consistent* with the conveyances. The appellee struggles to get over it by a *reckless* denial that there ever was any ante-nuptial contract; his counsel, at the same time, compelled to concede that there *was*, strangely attempted to construe it, not by its own tenor and terms, but by the deeds altogether inconsistent with it, reciting that their object was merely to fulfill it.

*The fact that they do not fulfill, but wholly evade and pervert it, is our complaint; and the answer is, because they do not fulfill it, as the appellee himself wrote it; therefore, he wrote it altogether wrong!!!* The conveyance may all be construed together, so far as it purports to define and regulate the title, but not for the purpose of controling and overruling the recited consideration, so as to show, for example, that a covenant by a husband to settle on the wife, *meant a settlement by the wife on the husband*; and when the husband *does not intimate* any mistake in the recital of the covenant, but is *driven by its manifest terms to deny that any contract was ever made, though estopped by his own recital of it.*

The case on this ground is clear and inevitable; and because conveyances acknowledged to be in consideration of the ante-nuptial contract do not fulfil, but totally violate it, they might undoubtedly have been set aside by Mrs. Wickliffe had she survived, and of course her heirs, representing her rights, and succeeding to them, must have the same right. Being *in vinculis*, she was not concluded had she understood the *technical* effect of the conveyances. But it is very evident that she *did not*, or that if she did, she understood that the title was to be held for her use, in fee, and be subject to her disposition; and this deduction is fortified by the fact, that *she, as admitted in his answer*, said, when the deeds were executed, that she would be satisfied

with dower, or whatever he might will her, *and would not require his written obligation.* And the fact proved by Mrs. Preston, showing that Mrs. Wickliffe *thought he was entitled to a beneficial and temporary interest, but that she herself had a right to dispose of the fee, and that he would be in honor bound to convey it according to her wishes.*

When Mrs. Wickliffe sent for Mr. Wickliffe, who was then at Frankfort, her great object was to secure the emancipation of her slaves, according to the marriage contract; and his own answer shows that this was the first subject discussed, and that there was some collision and no little negotiation; he refusing the emancipation unless she would surrender forever; and that her predominant wish was the emancipation which he *adroitly used* as a lever, and *that she still understood that he was to do scmething not mentioned in the writings.*

It is therefore clear and undeniable that he holds her whole real estate in violation of the marriage contract, and without any consideration whatever.

6th. But had there been no such contract, the conveyances should be avoided on the ground that *his answer admits* that the transaction was a bargain, and that, in the negotiation of it, he agreed that she should have her *whole estate* during her life; yet the tripartite deed concedes to her *only about half* of her estate; and he shows that he denied to, and withheld from her, the profits even of that. (See *Jenkins vs. Jenkins,* 3 *Monroe,* 320.)

7th. Lastly, this is a clear case of constructive fraud. The relation of husband to wife is pre-eminently one of *trust and confidence.* And in all such cases, when the husband, by contract or purchase, acquires the real estate of the wife, and especially on unequal and disadvantageous terms to her, the law to prevent the abuse of the influence of that relation by fraud, not easily exposed, presumes *prima facie* that the estate was procured by fraud. On this head, in addition to the authorities referred

to in the briefs of my coadjutors, see 1*st Story's Equity*, sections 258, 267, 308, 312, 321.)

Here the conveyances conclusively show that there was a contract *for some conventional consideration.* And it is manifest that there not only was not full equality or reciprocity, but that the husband got *all* for *nothing.* And not only is the *prima facie* presumption of fraud not repelled by a particle of proof, but it is *fortified by the appellee's own testimony*, tending to show that Mrs. Wickliffe had been impressed with the delusion that her title was so involved, and her lands so incumbered with debts, that she would have been reduced to poverty, had she not conveyed all to her husband. There is neither proof nor presumption that her title was doubtful, or that it was incumbered by debts or otherwise. Then who made the *false impression* on her? He, whose *duty it was to acquaint her with the utmost good faith, with the true condition of her estate, and with all her rights, and all the consequences of the conveyances he procured.* If this is not a case of constructive fraud, we should be pleased to know where to find one, or to hear what is such fraud in judgment of law.

Then we expect to succeed, first, on the ante-nuptial contract; secondly, on that admitted by the appellee; and thirdly, either with or without the one or the other, on the grounds of constructive fraud. And we shall expect also a decree for rents and profits from the death of Mrs. Wickliffe, without any deduction for improvements, (if any) except so far as they may be clearly shown to be ameliorations.

We cannot for a moment apprehend defeat; which, with all due respect, we should consider a reproach to our jurisprudence, and to the justice of the country, ennobled by the blood of Col. John Todd.

*M. C. Johnson, Tho. A. Marshall, Geo. A. Caldwell,* and *B. & J. Monroe*, for appellee—

Argued, that the decree of the circuit court was right and should be affirmed:

1st. Because, though fraud is liberally charged in the plaintiff's petition and amendment, it is denied, and there is no attempt by proof to sustain, the charge.

In the amended petition, filed some months after the original had been filed, it is for the first time, in plaintiff's pleadings said, that there was an ante-nuptial agreement between Robert Wickliffe and Mary O. Wickliffe, which stipulated, "that at a con-'venient time they would make a proper disposition ' of the estate of said Mary, and a portion of that of ' said Robert, by way of jointure or settlement on ' the said Mary;" and " that they believe the convey-' ance to said Chinn and Owsley were made by the ' said Mary, on the sole consideration of said agree-' ment, and with the expectation that her real estate ' thereby conveyed, would be held in trust for her as ' well as the defendant, during their joint lives, ' and would, after the death of both of them, go to ' her heirs, or revert to her if she should survive him; ' and under the full assurance and belief that a com-' petent settlement, as promised, would be made up-' on her of the estate of said defendant, and which ' they aver has never been made; wherefore, they ' charge, that for her use there was no sufficient con-' sideration for said conveyance, otherwise than as ' promised aforesaid, and that as far as there may ' have been any such consideration therefor promis-' ed to her, it has altogether or essentially failed, by ' the signal non-performance of said defendant." This amendment was filed after the defendant had filed his answer to the original petition denying the alleged fraud, and seems to be founded on the ante-nuptial agreement recited in the tripartite deed to which the counsel for appellants attempt to give a construction. The counsel for appellee deny alto-gether the propriety of that construction; and insist, that the deed reciting the ante-nuptial agreement, and proposing to carry it into effect, must be pre-sumed, in the absence of all proof to the contrary,

to be effectual for the purpose intended. (*Randall vs. Wells,* 5 *Vez.* 275; *Heneage vs. Hontake,* 2 *Atk.* 457, 455.) And if the validity of the conveyances is to be tested by their conformity to the ante-nuptial agreement, the conveyances must be regarded as valid on that ground if no other.

2d. We deny that the chancellor has any power, after the husband shall make a settlement on the wife in pursuance of an ante-nuptial agreement, and she dies without issue, (who were to be regarded as interested in that settlement,) at the instance of collateral heirs, to set aside that settlement for their benefit; the parties cannot be placed in *statu quo.* (*McQueen on Husband and Wife, Law Lib. vol.* 66, page 252 *to* 255; *Atherly on Marriage Settlements,* 117, 66 *vol. Law Lib.*) The utmost that the chancellor has ever done has been at the instance of the wife or children to reform a settlement—make it conform to the ante-nuptial agreement, or require it to be so made; and this has never been done unless the agreement was produced. (*Newland on Contracts,* 342; *Cordell vs. McRill,* 3 *Atk.* 290; *Ambler* 215.)

The recital on the deed is not intended to be a full recital of the whole of the ante-nuptial agreement. (See 2 *Atkins, supra,* 455, 457,) but only brief notes thereof.

3d. Marriage is a valuable consideration, (*Churchman vs. Harvey, Ambler,* 340;) and where it forms any part of the consideration of a conveyance, the amount of pecuniary consideration becomes immaterial. (*Prebble vs. Boghurst,* 1 *Swanton,* 319.) "Courts of equity will not judge according to strict rules of law on a gift of lands *causi matrimoni prolocuti.*" (2 *Atkins,* 202.) That marriage formed part, indeed the principal part, of the consideration of the conveyance of Mrs. Wickliffe, of her estate, to be conveyed to her husband, cannot be doubted by any reflecting mind. If there had been no marriage intended between them there would never have been any agreement whatever for any conveyance of property—it

was only with a view to such connection that it was made.

What was the substance of this agreement, that a proper disposition should be made of Mrs. Wickliffe's property at some convenient time after marriage; and "the beneficial interest should vest in said Robert?" It was, that such disposition should be made of the beneficial interest in her estate, which was a fee simple, as should vest in him, of course, a fee simple, for words of inherittance are no more necessary in limiting the beneficial than the legal interest. The beneficial interest in her estate means the whole beneficial interest, and that in the whole estate, regarding duration as well as extent; and unrestricted as it is, it cannot have been intended to denote either a joint interest in both during their joint lives, or a contingent fractional interest in him for life; if he should survive, this beneficial interest was to be vested in said Robert by the terms of the agreement, which it was intended should be executed. Of course it is not contended that the words "a proper disposition of the estate" indicated, by their own force, that the fee simple was to be conveyed to Mr. Wickliffe—they indicated no special disposition, but were applicable to any which the parties themselves should deem a proper one, and designate as such, and are rendered reasonably specific by the concluding declaration, that as part of the agreement, "the beneficial interest shall vest in the said Robert." The plain meaning is, that he was to have the benefit of her estate, which was a fee simple estate, and he was to own it.

Why was it necessary to make any agreement to dispose of Mrs. Wickliffe's estate? The fee simple was in her, and there it would remain until her death. There was no necessity to dispose of it in order to secure it to her. The law, it is admitted, would give Mr. Wickliffe control of it during their joint lives. It was therefore unnecessary to make any stipulation for securing that interest if this view

be not correct. The acts of the parties show it to be correct.

4th. It is insisted for the appellee that Mrs. Wickliffe's deed made to Chinn, in conjunction with her husband, passed her whole estate to him; and that to Owsley, years afterwards, is to the same purport. That the conveyance to Chinn was made and acknowledged by Mrs. Wickliffe, with a full knowledge of its purport, and that the object was that a fee simple title might pass through Chinn to Robert Wickliffe, her husband. That she afterwards made the conveyance to Owsley, for the same purpose, under an impression that the deed to Chinn had some defect in its authentication, (in which the parties were most probably laboring under a mistake of the law.) These conveyances were acknowledged before the proper officer and duly recorded. And under the authority of the case of *Scarborough vs. Watkins, &c.* (9 *B. Monroe*, 547; *Story's Equity, sec.* 64; *Clancy on Rights of Married Women*, 350,) Mr. Wickliffe has a clear title to the property conveyed.

The fact that the law required the clerk to show and explain to Mrs. Wickliffe the deeds to Chinn, and that to Owsley, (and indeed all deeds, before he takes the acknowledgment of a *feme covert*,) forbids the idea that she was in any manner deceived as to the contents of these deeds; and the deed to Owsley made about eight years after that to Chinn, and of the same import, and to carry into effect the same purpose as that to Chinn, shows beyond the possibility of a doubt that she understood well the purport of those deeds, and was fully satisfied with their provisions, and so far from desiring to retract, showed a full purpose to confirm and render effectual, all the provisions of the first deed to Chinn. Surely, in the space of eight years, Mrs. Wickliffe had full opportunity, as well as her relations, who might be hoping to enjoy her estate at her death, to know the purport of the deed to Chinn, made in

1827, and refuse to ratify it by a conveyance of the same purport to Owsley, in 1835.

5th. It is denied that courts of equity have ever applied to a case like the present that rigid rule which is applied to contracts between guardian and ward, attorney and client, &c., which requires that the transferee shall be required to show that a fair price was paid, and that all was fair, &c.; and that for the obvious reason given by the court in the decision in the case of *Prebble vs. Boghurst*, (1 *Swan.* 319,) that "when marriage is one of the considerations, the amount of pecuniary consideration is immaterial," and 2 *Atk.* 202, *supra; Bradish vs. Gibbs*, 3 *John. Ch. R.* 550; *Jones vs. Marsh Ca. Cotemp. Talbot*, 64; 2 *Liv.* 70; 2 *Wilson*, 358. And as a farther reason, the relation between husband and wife is presumed by the law to be one of mutual confidence and affection—of sympathy of feeling and interest; and the law will not presume that this confidence and friendship has been violated, or in any way abused until it be proved by those who charge it. If the law was as insisted, there would be no security to a purchaser of real estate from husband and wife, and there would be but few sales.

6th. The plaintiffs are barred by lapse of time. (See *Field vs. Wilson*, 6 *B. Monroe*, 81; *Erwin vs. Ware;* 2 *Ib.* 65; *Talbot vs. Todd*, 5 *Dana*, 195; *Ib.* 414; *Crane vs. Prather*, 4 *J. J. Marshall*, 77; *Breckinridge vs. Churchill*, 3 *Ib.* 15; 3 *Monroe*, 4; 5 *Ib.* 93; 6 *B. Monroe*, 318; *Ib.* 424.) The plaintiffs cannot protect themselves under the savings in statute of 1796, or that of 1814, and are barred.

*R. W. Woolley*, on the same side—

Two positions are taken by the counsel of appellants :

I. That there is a material and irreconcilable difference between the ante-nuptial verbal contract, as recited in the tripartite deed, and the conveying and covenanting parts of the same deed.

II. That there being such difference, and simply and only because of such difference, the whole deed, recitals, ante-nuptial contract and all, are just void; nothing more, nothing less. Not defective, not erroneous, but null and void.

I. As a fact, I deny the truth of the first position. But, if that is true, I deny the correctness of the conclusion of law as asserted in the second position of opposing counsel.

Is there any difference between the *ante-nuptial parol contract* and its execution after marriage? I think there is force in the mode in which I state the question. Not whether there is a difference between the recitals and the conveying portions of the deed, but a variance between the contract as it was actually and truly made *before marriage*, and its execution afterwards.

I maintain *first*, that so far as there is *any* evidence of an *ante-nuptial* contract, it has been observed—and,

*Secondly*, that there can be, from the nature of the case, no evidence of any contract before marriage, inconsistent with the executing parts of the deeds themselves.

The first inquiry directs us to the *consideration* of the supposed *ante-nuptial contract.* I say there were *two:*

*First*, that of marriage, which the law always supposes, and which is proved in this case to be based upon love and affection; and,

*Secondly*, in view of and affected by that state of mind existing between the parties, a proper and ultimate disposition of their property.

Mr. Beck says that " the appellee is estopped from 'setting up any other consideration from that ex-'pressed in the recited agreement." I deny that the proposition is legally correct, and if it is, still both considerations I have stated are recited in the agreement. I maintain, that even if it were true that the only consideration to be gathered from the *tripartite deed* is the arrangement of property, still as it

is not declared to be the *only* consideration, and as the sufficiency of the consideration is one of the subjects the plaintiffs seek to investigate, any other which is perfectly consistent, and tends to sustain the contract, can be proved in *support* of the contract. And I say that it *is* proved all over and through the whole record, except in the scandalous libels of the plaintiffs, that Mrs. Wickliffe loved her husband beyond all living mortals. I refer the court to the depositions in the record, in which it is proved that the strongest consideration which operated upon Mrs. Wickliffe, was love and preference for her husband. But marriage is recited as a consideration in the tripartite deed.

The other consideration, or part of the consideration contended for, is the arrangement of the property. According to the division above made, I maintain that the executed contract, substantially, and for all legal and equitable purposes, carried out the recited agreement, and that if it does not, in the absence of extraneous proof, and in view of the relations of husband and wife, the conclusive presumption of law is, that what the parties did, and what they acquiesced in after it was done, is just what they always intended to do.

Three propositions are contended for by plaintiffs. *One* is, that Mr. Wickliffe agreed to settle upon his wife *all* her estate. *Another*, that the simple recital in which he makes that agreement estopps him to deny it, although other portions of the deed contradict and disprove the recital, or rather the construction endeavored to be forced upon it: and the *third*, that it is recited in terms, and that such was the contract, that Mr. Wickliffe was to have only a life estate.

I will briefly dispose of these positions. From the beginning to the end of the tripartite deed, there is no recital that "*all*" of Mrs. Wickliffe's property was to be settled upon her. The language is a "proper disposition of the estate;" and this court has decided in the case of *Scarborough vs. Watkins*, 9 *B. Monroe*,

545, that it was a "proper disposition" for a wife to make by giving all her property to her husband. But it is urged, that as this "proper disposition" was to be made by jointure and settlement, the portion contributed by Mr. Wickliffe must be equal to that contributed by his wife, otherwise the jointure will be void. I have looked in vain for a case in which that doctrine is held. Lord Hardwick, in the case of *Harvey vs. Ashley*, 3 *Atkyns*, 610, held that " *the principal consideration is the marriage*," and that " the estate settled may be greater or less;" and supposing a case of an *infant* who married a man of great estate, where the dower being *one third*, she had a jointure of only *one tenth* of the estate, says "she shall not set it aside upon the inequality between the dower and jointure "

Counsel must assume that the single recital in the early part of the tripartite deed, that the parties agreed to make a " proper disposition" of the estate of Mrs. Wickliffe, estopps the appellee to deny that the meaning of that recital is, that. *all* the estate of Mrs. Wickliffe was intended, although other parts of the deed show that such was not the meaning intended; and the very authorities which he quotes to sustain his position are those to which I refer the court to show that the deed must be construed according to the general intention of the parties, to be gathered from the whole context. (*Stephens' Nisi Prius*, 1060–1; also, 2 *Bos. and Pull.* 26.) The case of *Baynham vs. Gray*, 7 *Vezy, page* 296; and *Moore vs. Foley*, 6 *Vezy*, 257, have reference to the construction by parties to a covenant by their acts after it was made, and not to the intention upon its face. The appellee is not estopped from showing, that by a consideration of the whole deed, as one act, there exists no variance.

The only other difference between the *ante-nuptial* contract and its execution, is that Mr. Wicklifle by the recitals, was to have merely a life estate, whereas he has caused a settlement to be executed, assuring

a fee with present use for life, with a life estate carved out for his wife if she survived, remainder in fee to himself. This variance is declared to be patent upon the face of the deed itself. This assumption, so far as I can gather from the argument of counsel, is based upon the meaning and effect of the words "*jointure* and "*beneficial interest*." I contend that the meaning of these words must be ascertained by the context of the sentence and instrument in which they are incorporated, and that when so ascertained I maintain that they do not mean a life tenancy. But, as they were used in the deed itself, and as the deed proceeds to carry out "their said understanding" in reference to the "*jointure*," then the subsequent portion of the deed is nothing more on this point than a declaration of what the parties meant by "*jointure*." The words "*beneficial interest*," are subject to the same construction.

But a "jointure" is not of itself an estate in fee simple, it is "a competent livelihood of freehold for the wife," &c. (*Coke*.), Waters proves the livelihood *competent*, and the tripartite deed makes that livelihood a *freehold*. But it was not imperative to make a jointure. The alternative was given to make a settlement. A settlement has been made.

II. Having met the position that the ante-nuptial agreement was not executed in the settlement, I propose to answer and refute, as I think I can successfully, the second position assumed by the plaintiffs, viz: that if the execution differs from the previous understanding, that then the whole settlement is simply void.

I deny, that in the absence of actual fraud, it has ever been decided that a mere failure to execute a previous marriage contract annulled the contract itself, or that in the absence of fraud, a mere defective execution produced that effect. My position is that the invariable course is to supply the defective settlement by a decree for execution according to the terms of the contract as it is exhibited to the chancellor.

A leading case upon this subject is *Sidney vs. Sidney*, 3 *Peere Wms.* 270, where the wife was allowed to exhibit a bill for a specific execution of the antenuptial contract, although she had been in adultery with another. But perhaps the most satisfactory mode of refuting the position of opposing counsel on this point, is to ask of the court a critical examination of the authorities referred to by them, which I assert confidently, fail to support the positions they are relied upon to sustain. *Atherly on Marriage Settlements*, 119, 152, is referred to; and therein the cases of *West vs. Gressy*, 2 *Peere Wms.* 349, and *Robert vs. Ringley*, 1 *Vezy, Sr.* 238, are referred to by the author, and upon examination of these cases it will be found that the settlement was not declared void, but was ordered to be rectified. Reference is also made to *Barstow vs. Kelvington*, 5 *Vezy*, 593; and *Doran vs. Ross*, 1 *Vezy*, 57. In the former case the sttlement was not declared void nor set aside, but was simply reformed according to the original purpose of the agreement. In the latter case the settlement was neither declared fraudulent, set aside, or even reformed, but the settlement was allowed to stand by reason of the *uncertainty* in the words of the agreement. The case of *Montacute vs. Maxwell*, 1 *Peere Wms.* has nothing to do with the subject, it is a leading case upon the subject of executing a previous parol marriage contract. The cases in 3 *Henning & Munford*, 299; 2 *Leigh*, 76; 1 *Reed*, 132; 1 *Devereaux & Battle*, 327, have no earthly reference to the doctrine.

The law is this. The settlements between husband and wife, in the absence of actual fraud, is always good to carry out its provisions until some one interested in the marriage settlement shows that the agreement has been departed from; then if that agreement is clearly and satisfactorily proved by *competent* evidence, the court will let so much of the settlement stand as executes the agreement, and make the rest conform to it, and this is done not upon the ground of fraud; but because there is no ade-

quate remedy at law the contract will be executed specifically. (*Sir Ralph Bovey's Case*, 1 *Ventris*, 193, commented upon by Chancellor Kent, in *Read vs. Livingston*, 3 *Johnson's Ch. Ca.* 489.)

There is one other ground assumed by the counsel of plaintiffs. It is that, the relation of husband and wife is of that delicate and confidential character, that all contracts made by them, in reference to *land*, of which the fee is in *her*, are to be closely scanned and viewed with suspicion and jealousy. This idea is advanced as an acknowledged truth by both counsel, and in support of it they cite no authority, because none can be found. Without going into a critical analysis of various authorities which bear upon, and are decisive of the very converse of this proposition, I content myself with reference to them here: *Scarborough vs. Watkins*, 9 *B. Monroe*, 545; *Milnes vs. Rusk*, 2 *Vesey, Jr.* 487; *Bradish vs. Gibbs*, 3 *John. Ch. Ca.* 550; *Parke vs. White*, 11 *Vesey*, 222; *Jacques vs. Methodes, &c.* 3 *John. Ch. Ca.*; *Noldes vs. Preston*, 2 *Willis*, 400.

The only remaining question is in regard to the length of time which has elapsed from the period when the property was conveyed to Mr. Wickliffe to the commencement of this suit.

In equity husband and wife, in relation to the wife's property, are considered as separate persons, and may maintain actions against each other, in relation thereto. If any constructive fraud has been perpetrated, the discovery must have been simultaneous with the execution of the deed of the 12th of September, 1827. The bill alledges no discovery, which it should have done, (6 *Ben. Monroe*, 481,) and should have distinctly charged the date of the discovery; but, if it be conceded that a fraud was committed on the 12th September, 1827, then the bill has been postponed too long, and a court of equity cannot disturb these family transactions after such a lapse of time. If Mrs. Wickliffe had been alive she could not have exhited her bill after an ac-

quiescence of twenty-six years, and for still stronger reasons the complainants are barred from demanding relief.

The general statute of limitations of 1796, applied the generel bar of twenty years to all rights of entry. The 3d section of the act contained a proviso in favor of infants, *femes covert*, persons *non compotes mentis*, &c., giving them ten years next after the removal of the disabilities, or death of the person so disabled, to bring their actions. Afterwards, in 1814, the legislature passed an act repealing the savings of the 3d section of the act of 1796 in relation to *femes covert*, and leaving them on the same footing with all other persons, except in two instances, viz: where lands had been or were devised by will, or descended to a *feme covert*, during the coverture, and in no other case. The effect of these two acts was fully considered by this court in the case of *Masterson's heirs vs. Marshall*, (5 *Dana*, 415.) In that case the land in controversy had been in possession of Masterson's heirs from the year 1795. In 1820 Humphrey Marshall and wife filed their bill asserting a superior equitable title. Masterson's heirs had the inferior title, and relied on the statute of limitations. Mrs. Marshall derived her title from a deed from her father, Thomas Marshall, dated in 1794, before possession was taken, and made while she was a *feme covert*, being then the wife of Humphrey Marshall. The circuit court held that the continuing coverture of Mrs. Marshall saved her rights, and exempted them from the operation of the statute. Upon review the court of appeals decided that the 2d section of the statutes of 1814 repealed the savings in the 3d section of the act of 1796, except where the property was acquired by *descent* or *devise during coverture*, and that as Mrs. Marshall acquired by deed, though during coverture, she was within the operation of the general act, and not within the savings of the three years allowed by the 2d section of the act of 1814 to *femes covert* who might acquire lands by

descent or devise during coverture.   The counsel for Wickliffe rely on the two acts of 1796 and 1814, and their interpretation by the court in *Masterson's heirs vs. Marshall's heirs, supra,* as showing that the statute of limitations commenced running againt Mrs. Wickliffe and her real representatives on the 12th September, 1827, and, even were she living, that she would be barred by the lapse of time, and that her heirs cannot occupy a better attitude.   This doctrine was even more strongly expressed in *Riggs vs. Dooley,* 7 *B. Monroe,* 240, and *Boyce vs. Dudley,* 8 *B. Monroe,* 511.

In a recent case, decided by this court at the spring term 1857, *Way vs. Prather,* a bill was filed by a *feme covert* in 1855, to correct a conveyance made in 1836, in which there was an evident mistake, as the *feme covert,* Mrs. Way, was proven in anticipation of her marriage to have requested her brother to have a deed prepared to secure her property to herself and her children, and the deed was so drawn, as to *fix remainders over* in persons outside of her directions, a form having been copied by the draftsman which had that effect, and yet the court would not correct, cancel, or disturb the conveyance on the ground of the nineteen years acquiescence of Mrs. Way, though she averred that she had only discovered the mistake or fraud about four years before the filing of the bill.

The right of action accrued as soon as the fee passed to Chinn.   The fee vested in him at least for an instant.   By the statute, which has the same force as livery of seizen, possession was transferred with the fee.   Chinn had, therefore, for some appreciable period, both fee and possession.   The possession was not under Mrs. Wickliffe, but against her. That fee and that possession he *afterwards* passed to Mr. Wickliffe.   But while Chinn was so seized and possessed the statute of limitations commenced running, and when once the statute commences nothing can stop it.   (1 *Bibb,* 181; 2 *Bibb,* 537; 3 *Mar.* 41;

13 *B. Mon.* 409.)   See also the case of *Patrick vs.*

The foregoing views, it is conceived, conclusively show that the complainants have not only failed in proving that the conveyances were obtained by actual fraud, but in repelling the forced and tortured methods by which they have attempted to infer a constructive fraud. The utmost that legal ingenuity could wring from the facts, is a mere omission of some immaterial and unproductive parcels of property by drawing them by implication within the recital, and making it overrule the conveyances themselves in their specific and material portions. No precedent can be found in any case for using a recital for the purpose of overruling the instrument containing it. Even if it were so, it would merely demonstrate that there was a *mistake* or omission. A fair examination renders the inference of a constructive fraud impossible. The utmost would be a mistake, and the remedy would be to correct the instrument. Such correction would now be superfluous, as it would be fruitless. Mrs. Wickliffe never, under the marriage agreement, could have had any estate, *except in the* event she should survive her husband. That contingency never occurred. She then would have had only a life estate. Is that inheritable? Her heirs are not within the marriage agreement, and have no right to file a bill in equity asking a reformation of an instrument in which they are not beneficiaries. Twenty-six years have elapsed between the pretended commission and discovery of the fraud and the filing of this bill, and the statutes of 1814 and 1796, and the principle decided in *Masterson's heirs vs. Marshall's heirs,* 5 *Dana,* forever bar the plaintiffs from maintaining this suit.

The counsel for Mr. Wickliffe, in conclusion, submit to the court these considerations, under the conviction that the cause cannot be reversed. The litigation to which the appellee has been subjected is one of the most extraordinary in the legal history of

TODD'S HEIRS
vs.
WICKLIFFE.

the state. For years he has been relentlessly pursued in relation to this property, and although he commands the respect of society in private life, although he has earned a distinguished reputation for talent and integrity at the bar, although he is now the oldest member of the profession and the oldest officer of this court living, yet he has been subjected to the most calumnious assaults by the pleadings in this cause, has been charged with the most dishonest, unprofessional, and vile practices, and has been accused of the foulest actual frauds, while not a shadow of proof has been adduced to sustain the charges. A conviction is felt that the want of knowledge as to professional propriety, and the courtesy which should mark the conduct of legal proceedings by gentlemen, and the malignity which disfigures the proceedings, will meet with little favor from this court. A long life of usefulness and honor will preserve the character of Robert Wickliffe from the calumnies of his enemies, and the justice of this court will, it is hoped, protect his property from the rapacity of the complaints.

Feb. 6, 1858.

Chief Justice WHEAT delivered the opinion of the court.

In the month of October, 1826, Robert Wickliffe and Mary O. Russell intermarried. Both parties resided in Fayette county, Kentucky; the latter was a widow, who then owned several tracts of land; some houses and lots in Lexington, and sundry slaves, to all which she had a title in fee simple.

On the 12th day of September, 1827, Robert Wickliffe and his wife Mary O. Wickliffe, by their deed, conveyed all the real property and slaves which the said Mary O. owned at the time of her marriage, (excepting such land as was held adversely,) to Richard H. Chinn, who on the same day conveyed the same property back to Robert Wickliffe, for the consideration expressed in a tripartite deed of that date, to which said Chinn and both of the Wickliffe's were parties.

The latter deed witnessed, " that whereas, it was
' verbally agreed between the said Robert Wickliffe
' and Mary Owen Wickliffe, his wife, previous to their
' intermarriage, that they would at convenient time,
' make a proper disposition of the estate of the said
' Mary Owen Wickliffe, and a portion of the estate
' of the said Robert, by way of jointure or settle-
' ment upon the said Mary, and by which the said
' Mary Owen Wickliffe should be vested with the full
' and entire power by her last will and testament to
' emancipate or otherwise to dispose of any or all the
' slaves and their descendants, of which she was pos-
' sessed at the time of her intermarriage, although
' she might depart this life before the said Robert;
' and that the beneficial interest in her real estate
' should vest in the said Robert.   And whereas, the
' said Robert and Mary Owen Wickliffe, with a view
' to effect their said understanding and agreement,
' have on this day conveyed unto the said Chinn the
' real estate of the said Mary, except such as is held.
' in adverse possession, and the said Chinn hath con-
' veyed the same to the said Robert Wickliffe in fee
' simple, and with a view completely to carry the said
' agreement into effect, it is hereby stipulated and
' agreed between the parties, that the said real estate
' and every part of it, so conveyed to the said Robert
' Wickliffe, shall stand and be confirmed unto him
' and his heirs and assigns forever.   In consideration
' whereof, and the further consideration of one dollar,
' to the said Robert in hand by the said Chinn paid,
' the receipt whereof is hereby acknowledged, he
' the said Robert Wickliffe, doth covenant and agree
' to and with the said Chinn, that he will stand seized
' and possessed of the tract of land commonly called
' the pond tract; being composed of a part of the
' pond tract properly so called, and the Mansfield
' tract, also of the Ellerslie adjoining thereto, also the
' mansion house in which the said Wickliffe now re-
' sides in the town .of Lexington, together with the
' lots within the same general inclosure which in-

'cludes the said house, to the use and benefit of the
'said Mary O. Wickliffe during her natural life, and
'in the event she should survive him the said Robert,
'then to be held and occupied and enjoyed by her
'for during the term of her natural life, free from all
'sales, if any, which he might make without her con-
'sent, and all his debts or creditors, hereby declaring
'that the said Mary Owen Wickliffe shall, in lieu of
'her dower in other lands, have, hold, and enjoy the
'same, free of all impeachment of waste, to use at
'her pleasure during her life, if she should survive
'him, and then to pass to his heirs, devisees, or as-
'signs; and he doth further covenant and agree, that
'in the event of his said wife surviving him, that
'the whole of the slaves of which she was possessed
'at the time of their intermarriage, together with the
'descendants thereof, shall vest absolutely in the said
'Mary Owen Wickliffe, and that he will not during
'their joint lives, sell or dispose of any of said slaves
'without her consent in writing first had; and the said
'Wickliffe doth further covenant, that in the event of
'his said wife departing this life before him, that
'she may by her last will and testament or other
'instrument in writing, liberate all said slaves, or
'any of them, or by last will and testament to dis-
'pose of them in any manner she may desire; and
'for himself and his heirs, &c., he hereby covenants,
'she shall have full power and authority, irrevocably
'to make and publish a last will and testament, here-
'by on his part ratifying and confirming the same in
'relation to said slaves, and covenanting to be bound
'and governed thereby; but nothing in this article
'or deed is to be so construed, as to prevent the said
'Wickliffe and wife, by their joint deed or other in-
'strument in writing, from liberating or otherwise
'disposing of the said slaves, or any of them, nor to
'prevent the said Wickliffe from controlling them as
'his slaves during their continuance in slavery un-
'der the said Wickliffe and wife, or either of them.
'It is further understood, that the provisions in rela-

' tion to the slaves aforesaid, or the slaves Peter and
' Jim, shall in no wise prevent the said Mary Owen
' from her dower and distribution in the other slaves
' and personal estate of said Robert Wickliffe; but
' in the event of the said Robert dying intestate, or
' making a will unsatisfactory to her, she is to have,
' take, and enjoy her dower and distributive share in
' his slaves and personal estate, inclusive of the
' slaves aforesaid.

" In witness whereof, the parties aforesaid, set their
' hands and affixed their seals, &c."

The same real estate and slaves was afterwards
conveyed by Robert Wickliffe and wife, to William
Owsley, who re-conveyed it to Robert Wickliffe, on
the same day.

These two last conveyances were made, as it is
alleged, to cure some supposed defect in the previous deeds. Mary O. Wickliffe died in the year 1844.
This action was commenced in the year 1854, by
persons claiming to be the heirs of Mary O. Wickliff, to set aside the before mentioned deeds, and for
other relief, prayed for in the appellant's pleadings.

Appellants in the court below based their claim to
the relief which they sought upon these grounds:
1st. The want of consideration to uphold the deeds.
2d. For want of legal, authentication of the deeds.
3d. For the want of ability in the parties to contract
in such form.  4th. Fraud in obtaining the deeds.
5th. For a failure of the consideration upon which
the deeds were executed.

Robert Wickliffe, by his answer and amended answer, denied every material allegation in the appellant's petition and amended petition. Upon final
hearing, the circuit court dismissed appellant's petition with costs, and they have appealed to this court;
and now insist upon a reversal, upon the grounds
above stated. We shall consider these grounds in
the order in which they are stated.

First. The consideration stated in the tripartite
deed, is a sufficient consideration, although not a

Todd's Heirs
*vs.*
Wickliffe.

sufficient con-
sideration be-
tween husband
and wife, and
will support a
deed from the
wife to the hus-
band when made
to carry into ef-
fect an antenup-
tial agreement
between the
parties.

large one. If Mary O. Wickliffe was capable of contracting, she was competent to judge of the sufficiency of the consideration, and had a right to convey her property to her husband, in this indirect mode, upon a small consideration, in property, or even upon the consideration of love and affection alone; or upon consideration of marriage; which seems to have been the moving consideration to the ante-nuptial agreement.

Second. As no objection was pointed out to the authentication of the deeds, either in this court, or the court below, we shall not further notice the second ground stated.

Third. As to the third ground, we deem it sufficient to say, that this court decided in the case of *Scarborough vs. Watkins and Wife*, 9 *B. Monroe*, 546, that a conveyance by husband and wife to a third person, of the real estate of the wife, for the purpose of being conveyed to the husband, to invest him with the estate of the wife, is valid, if made without coercion or undue influence of the husband.

2. A convey-
ance by husband
and wife of the
real estate of
the wife to a
third person,
with the intent
that it be recon-
veyed to the
husband alone,
to invest him
with the title to
the estate, is val-
id if made with-
out the coercion
of the husband,
or any undue
influence over
the wife. (*Scar-
borough vs. Wat-
kins & Wife*, 9
*B. Mon.* 546.)
3. The rule of
law which re-
quires of a guar-
dian, trustee, or
attorney con-
tracting with
the ward, *cestui
que trust*, or cli-
ent to show the
entire fairness of
the transaction,
has never been
applied to hus-
band and wife
where the wife
conveys proper-
ty to the husb'd,
as by the an-
cient common

Fourth. Upon the fourth ground, appellants insist, that constructive fraud existed, as evidenced by a conveyance of the wife's property to the husband, and that the burden of the proof is upon appellee to show that he acted fairly when he obtained a conveyance of his wife's lands. We admit, that where certain persons standing in certain relations to each other, trade, as where a trustee, obtain a conveyance from the *cestui que trust*, or a guardian obtains one from his ward, when such conveyances are impeached by the party who conveys, the law requires the fiduciary to prove that the transaction was fair, and advantageous to the person who under such circumstances conveyed. But we are not prepared to admit, that this rule ever applied to husband and wife, as by the ancient common law there could be no dealing at all between them. In process of time, however, a mode was invented in England, by which a wife could, in conjunction with her husband, con-

vey away her real property. This process was a fine, or common recovery, which required the interposition of a court to make the conveyance effectual.

By this process the wife was enabled to convey, if upon privy examination in court, she declared that she signed and acknowledged the deed freely and voluntarily, and without the coercion of the husband.

By several statutes of this commonwealth, and particularly by the act of 1796, (*Stat. Laws*, 440, *sec.* 4,) it is provided that a *feme covert*, in conjunction with her husband, may by deed pass the title to her real estate of inheritance, upon privy examination, in the manner therein pointed out, and when so done, it is declared that it shall not only be sufficient to pass any right of dower thereby intended to be conveyed or released, but be as effectual for every other purpose, as if she were an unmarried woman.

By these statutes, the law provides a substitute for courts, to take the acknowledgments of married women, when about to convey their real estate. These substitutes are in substance empowered to do all that a court could do in such cases; and the same effect is given to their acts when done in the manner prescribed, as if the acts had been done in court.

In *Scarborough vs. Watkins and Wife*, 9 *B. Monroe*, 546, this court, speaking of the power of the wife to bind herself, said, "the general rule, that the wife ' cannot so contract as to bind himself, is, however, ' subject to exceptions. The wife, in conjunction with ' her husband, can convey away her real property. ' In England, this can only be done by a fine, or com-' mon recovery, which are effected by the interposi-' tion of a court. In this state, it can be done in the ' mode prescribed by the statutes regulating the sub-'ject, and, when done in that manner, it is consider-' ed as the free voluntary act of the wife, relieved from all coercion by the husband."

Now, if such act when done, is to be considered as the *free voluntary* act of the wife, *relieved from all coercion by the husband:* is it not absurd to say that in such

TODD'S HEIRS
*vs.*
WICKLIFFE.

law there could be no dealings between them.

4. The Statute of 1796, (*Stat. Law*, 440, *sec.* 4,) authorizes *femes covert*, in conjunction with their husbands, to convey their estate of inheritance upon privy examination in the manner pointed out by that act, and declares such conveyances to be as effectual to pass all her right as if she was an unmarried woman.

case, the court must consider such act *prima facie* fraudulent, where the husband happens to be the beneficiary, and thus to impose upon him the burden of showing that he acquired the property fairly which the conveyance was intended to pass? We think it absurd in the extreme. In all instances, (and they are many,) before the adoption of the Revised Statutes, where the land of the wife is sold and conveyed by the husband and wife for money, the money becomes the property of the husband, and yet no one ever supposed that all such conveyances were *prima facie* fraudulent.

On the contrary, we think the effect of the statutes is to make the conveyance *prima facie* fair, and the burden of proof is upon the party who insists that such conveyances are fraudulent. "Courts of equity 'examine every such transaction with great caution, 'and with some apprehension of undue influence, 'but unless such influence is evinced, the gift will be 'considered valid." (*Story's Equity Jurisprudence,* 764- 5; *Clancy on Married Women,* 350.) "If, however, 'the doctrine contended for, that in the case of a 'gift by the wife to the husband, a presumption of 'improper influence arises, had been recognised as 'just, courts of equity would never have sanctioned 'such gifts, but must have declared them illegal and 'void." (*Scarborough vs. Watkins and Wife,* 9 *B. Mon.* 546.)

The above was said in a case where the wife had *given* her real estate of inheritance to her husband. With equal, if not greater force, may such reasons apply, where the wife has conveyed her estate for a valuable consideration to her husband, even though done by the indirect manner in which it was done in the case now before us. If we are correct in coming to the conclusion above indicated, it follows that the appellants must show the transactions between Rob't Wickliffe and wife, and Chinn and Owsley, fraudulent, before the deeds can be set aside for fraud.

5. The chancellor will not presume that a conveyance by a wife to her husband, made through a third person, is fraudulent, and require of the husband proof of its fairness. (*Scarborough vs. Watkins & Wife,*9 B. *Monroe,* 546.)

Have they done so? We think not. But appellants counsel insist that the tripartite deed furnishes evidence of positive fraud against Robert Wickliffe. Giving a fair and reasonable construction to the recital of the ante-nuptial agreement in the last mentioned deed, and also the same construction to the deed, we think that that conveyance furnishes satisfactory evidence that every material part of the ante-nuptial contract was substantially complied with. But it is said that the portion of the deed which related to the slaves, was variant from the recital in the ante-nuptial contract. We are of a different opinion. All that Mary O. Wickliffe desired was to have the right secured to her to emancipate her slaves—that right was secured by the deed; and it does not appear that she chose to exercise that right. But it appears that the slaves have been emancipated. Suppose that part of the ante-nuptial agreement had not been carried out, who has a right to complain of the failure? Who has been injured? Not the slaves, who are the only persons to be benefitted by that part of the agreement. Even if there had been a substantial failure to comply with so much of the agreement as concerned the slaves, the most that could have been done, we apprehend, would have been a reformation of so much of the deed; and we are not prepared to say that this could have been done, at the instance of the appellants.

It is also insisted that the beneficial interest in Mary O. Wickliffe's estates, contemplated in the ante-nuptial agreement, meant only a life estate. As a beneficial interest in an estate may be co-extensive with the estate, no matter how great its duration may be; and as the parties to the tripartite deed seem to have used the word in its largest sense, with a full understanding that Mary O. Wickliffe was conveying her estate in fee to her husband, by the operation of the three deeds, and as she not only acquiesced so long, in what she had done at the first,

and after she had joined in a conveyance with her husband to William Owsley, and after Owsley conveyed the property to her husband, she still approved of her acts, and expressed herself satisfied with what she had done, we think we would judge rashly if we were to assume or conclude that she had not intended to use the word beneficial in the sense in which it is used in the deed.

But it is contended that Robert Wickliffe, by the ante-nuptial agreement, undertook to make a proper disposition of the estate of Mary O. Wickliffee, and a portion of the estate of the said Robert, by way of jointure.

We dot consider ourselves authorized to say what would be a proper disposition of the estate of Mary O. Wickliffe, and a portion of the estate of Robert Wickliffe, by way of jointure or settlement upon Mary O. Wickliffe. Robert Wickliffe and wife did make a disposition of her estate: they also made a disposition of a part of the said Robert's estate, by settlement upon Mary O. Wickliffe. The parties themselves, at the time considered this disposition proper, and we do not learn that Mary O. Wickliffe, although she lived about seventeen years after the tripartite deed was executed, ever thought that that disposition was not proper, and such as the parties concerned, fully understood and intended to make. The contrary seems to be true, for it is evident from the testimony in the cause, that Mary O. Wickliffe lived and died satisfied with the disposition made of her property, and the provision made for her by her husband. From the decision of the parties, as to what was proper, we think the parties concerned, being of sound mind, and of more than common intelligence, were the best judges, and from their decision on this subject, there ought to be no appeal.

When we consider the length of time which elapsed, after the execution of the first set of deeds, the execution of the second set, and when they

were executed, and the object in view, moving the parties to their execution, the continued acquiescence of Mary O. Wickliffe, as long as she lived, the satisfaction she expressed with what she had done, with the additional facts, that Wickliffe and wife lived together most amicably and happily, and that she had no children, nor any blood relations nearer than cousins, we think they present a series of circumstances repelling the idea that Mary O. Wickliffe ever thought herself defrauded in the execution of the deeds, or by the manner of their procurement, or that the conveyance of her estate was not upon sufficient consideration, or that there was any failure of the consideration.

To our minds these facts and circumstances fully repel the idea of fraud, or of the failure of consideration.

Upon the whole case, as presented by the record, a majority of the court have come to the conclusion that the decision of the court below was right upon the law and facts, without any regard to the plea of the statutes of limitations.

Wherefore, the judgment of the court below is affirmed.

Judge SIMPSON's dissenting opinion to the foregoing decision.

Not concurring with the other members of the court, in the opinion which has been delivered in this case, I deem it proper to suggest in a very succinct manner, the reasons for my dissent.

It should be recollected that the deeds which are assailed do not purport to be the offspring of the wife's bounty, nor founded upon the consideration of love and affection for her husband, but on the contrary, were made for the avowed purpose of carrying into execution an ante-nuptial contract of the parties.

The principles upon which the case of *Scarborough vs. Watkins and wife*, 9 *B. Monroe*, 420, and other analogous cases have been decided, have no application whatever to the present case.

Now, I regard it as a well settled principle of the law, that such a contract must, after the marriage of the parties, be carried into effect according to its true intent and meaning. And as the wife is in law incapable of contracting with the husband, she cannot consent to any modification of its terms which would be prejudicial to her interests. It is upon this principle, that it has been repeatedly held, that the writings which are executed by the parties after the marriage, to carry the prior contract into effect, are not to be considered, in giving construction to the contract; as it would be absurd to say, that the wife could not consent to any alteration of its terms, but might execute writings which would have that effect, and could be relied upon to show, that its meaning, as it was understood by the parties, was different from what it would be construed to be, independent of such writings.

What then is the true meaning of this ante-nuptial contract, and what construction would a court of equity give to it, if called upon to execute it specifically? This, it seems to me, is the real inquiry, upon which the whole controversy between the parties essentially depends.

The object of the agreement manifestly was, to make a suitable settlement upon the wife, and not to settle her lands upon the husband. It did not provide for any settlement upon him, but for a proper disposition of her estate, and a portion of his, by way of settlement upon her.

Had a court of equity been called upon to execute the contract, what interpretation would have been put upon it? Would the court have regarded it as applying to the lands of the wife, when no settlement of them upon her was necessary, inasmuch as the marriage would not divest her of the legal title to them? On the contrary, would it not have been construed as applying exclusively to that part of her estate which would vest in her husband by virtue of the marriage, and as to which, on that account it be-

came necessary to make an agreement for a settlement upon her. The parties should not be supposed to have intended a vain and useless act, and therefore should not be regarded as stipulating for the settlement upon the wife of that which would belong to her, independent of any such settlement. But, as by the terms of the agreement thus understood, the rents and profits of her land which, by law, would vest in the husband, would be considered as belonging to that part of her estate which was to be settled upon her, it was provided, that the beneficial interest in her real estate should vest in her husband. The object of this provision evidently was to secure him the benefit of the rents and profits of her lands, and exempt them from the operation of the stipulations in the contract, that her estate was to be settled upon her.

No court of equity would have ever construed that part of the contract as entitling the husband to a fee in his wife's lands. If such had been the intention of the parties when the contract was entered into, why was it not expressly stated that the lands of the wife were to be conveyed to the husband and to belong to him in fee simple? The contract is silent on that subject; does not speak of any conveyance that was to be made to the husband, but only declares that the settlement on the wife should be *so made*, as to vest in the husband the beneficial interest in her real estate. How was this to be effected? Evidently by leaving out of the settlement the rents and profitts of her lands whereby the beneficial interest in them would vest in the husband.

If the wife had survived the husband, can it be doubted that a court of equity would, at her instance, have vacated the conveyances which she executed, and have given her lands back to her. Are not her heirs at law entitled to all her rights, although they may not be so peculiarly the objects of the chancellor's solicitude, as the wife, or her children, had she left any, would have been.

My opinion therefore is, that the ante-nuptial contract has not been executed according to its true *spirit* and *meaning*, and for that reason, the deeds should be vacated and annulled, and the contract enforced specifically, so as to conform to the intention of the parties, as indicated by the terms and stipulations contained in their original agreement.

---

ERRATA.

---

Page 221, 10th line from the bottom, for *"grievance,"* read *"gravamen."*